**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-01652

GREGORY TUCKER,

      Plaintiff,

v.

FAITH BIBLE CHAPEL INTERNATIONAL, a Colorado non-profit corporation,
      Defendant.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiff, Gregory Tucker, by and through his counsel, Peter G. Friesen, Bradley A. Levin, Elisabeth L. Owen, and Elizabeth A. Walker of LEVIN SITCOFF PC, for his First Amended Complaint and Jury Demand against Defendant Faith Bible Chapel International, a Colorado non-profit corporation, states and alleges as follows:

**<u>INTRODUCTION</u>**

1.    This action arises from Defendant Faith Bible Chapel International's ("FBCI") racially discriminatory termination of Plaintiff Gregory Tucker ("Tucker") from employment as a teacher and dean at Faith Christian High School ("FCHS").

2.    FBCI was motivated to terminate Tucker because of his opposition to racial discrimination and harassment directed against him, as the father of a black daughter, and against racial minority students who attended the school. Specifically, Tucker organized a symposium to discuss racist behavior within the school with the intention of eliminating it. In direct response to

Tucker's organization of the symposium, FBCI, acting through its agents, fired Tucker on February 26, 2018.

3.       Tucker had been given authority to organize the symposium and was at first praised for it by the school's administration. However, after the symposium, students and parents who were guilty of the most racially incendiary behavior within the school were offended by the implied message that they were guilty of racism, and called for Tucker's termination. FBCI eventually succumbed to the pressure applied by these students and parents and fired Tucker.

4.       In the process of terminating Tucker, FBCI attempted to shield itself from the outrage expressed among parents who supported him by fabricating a false and pretextual basis for Tucker's termination: that Tucker was guilty of gross insubordination. FBCI publicly represented that it had confronted Tucker with accusations of his supposed gross insubordination and that Tucker had voluntarily resigned in the face of them. It was not true either that Tucker had committed gross insubordination or that Tucker voluntarily resigned.

## JURISDICTION AND VENUE

5.       This action is brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), which prohibits discrimination against an employee by virtue of his race, or for opposition to racial harassment directed against him or another employee. It also protects any employee who opposes racial discrimination or harassment against a person with whom that employee has a significant business or personal relationship.

6.       This action is also brought under Title VI of the Civil Rights Act of 1964 ("Title VI"), which prohibits racial discrimination, racial harassment, and retaliation in educational institutions that receive substantial federal funding and assistance. Tucker is informed and believes

that Defendant receives substantial federal assistance in the form of educational grants, loans, scholarships, and tax exemptions from the federal government.

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because the Defendant resides within this Court's judicial district and a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

## PARTIES

9.      At the time of the conduct alleged herein, Tucker was employed as a teacher and Dean of Student Life ("Dean") at FCHS. Tucker was a permanent resident of the State of Colorado.

10.     Defendant FBCI is a Colorado non-profit corporation. Among other things, FBCI's mission is to "conduct schools, conferences, and assemblies for worship, religious, educational, charitable, and benevolent work."

11.     FBCI is governed by a board of directors (the "Board").

12.     FBCI operates a vast business network. Each business activity of FBCI is carried out by a distinct enterprise, doing business under a trade name of FBCI.

13.     Faith Christian Academy ("FCA") is one enterprise doing business under a trade name of FBCI. FCA is tasked with operating educational institutions that serve grades K-12. FCHS serves grades 9-12 of FCA.

14.     FCA has its own independent management structure that ultimately reports to the FBCI Board. Similarly, FCHS has its own management structure, answerable to FCA management, and ultimately to the FBCI Board as well.

15.　This matter is designed to remedy unlawful conduct committed by the FBCI Board and the managers of FCA and FCHS, all of whom were acting on behalf of FBCI.

16.　FBCI conducts its business affairs in Arvada, Colorado.

**FACTUAL BACKGROUND**

I.　**FBCI AND ITS VARIOUS BUSINESS ENTERPRISES.**

17.　FBCI operates an extensive network of enterprises for various purposes, including a publication operation, a coffee shop, and an American Girls Heritage troop. Among these, FBCI operates a church, d/b/a Faith Bible Chapel International, Inc. (the "Church").

18.　FCA is an FCA business enterprise distinct from the Church.

19.　The FBCI Board oversees the operations of all of FBCI's enterprises and is tasked with the ordinary functions of a non-profit board of directors, including governance, legal compliance, and provision of services in accordance with the organization's mission.

20.　The Church's leadership team is separate and distinct from the FBCI Board.

21.　None of the Church's various ministries includes FCA.

22.　The Church is inter-denominational and is self-governed in that it does not report to any superior, hierarchical ecclesiastic authority.

23.　FCA has a management structure separate and distinct from the Church's.

24.　FCA is overseen by a superintendent who is responsible for managing the entire academy, grades K-12.

25.　Further, each of the elementary, middle, and high schools has its own principal and administration.

26.     FCA managers, including the superintendent and principals, report and are ultimately accountable to the FBCI Board.

27.     FCA represents itself as an "equal opportunity employer." To that end, FCA purports not to discriminate against employees on the basis of "race, color, biological sex, age, handicap, national origin, ancestry, marital status[,] or physical condition." In furtherance of this goal, FCA collects "equal employment opportunity data" from applicants for employment.

28.     FCA also purports to have a non-discrimination policy regarding its students, which ostensibly prohibits discrimination against students on the basis of "race, color, [and] national and ethnic origin."

**II.     TUCKER'S EMPLOYMENT AND JOB DUTIES AT FCHS.**

29.     In 2000, the FCA Superintendent and FBCI Chief Financial Officer ("CFO"), acting on behalf of FBCI, hired Tucker to teach high school biology, chemistry, and physics at FCHS.

30.     Tucker's employment contract, first entered into and subsequently extended on an annual basis, was between Tucker, on the one hand, and the FCA Superintendent and the FBCI CFO on the other hand.

31.     At the time of Tucker's initial employment, the FCA superintendent was David Hasz. In Tucker's last academic year of employment, 2017-2018, the FCA superintendent was Brian Wall ("Wall"). At all relevant times, the FBCI CFO has been Douglas Newcomb ("Newcomb").

32.     Before assuming employment at FCHS, Tucker earned a degree in sports medicine from Pepperdine University.

33.     Tucker has never received any education or training specific to becoming a clergy member of a church.

34.     As a teacher at FCHS, Tucker was responsible for preparing and implementing a full educational teaching plan, providing subject matter-specific knowledge and instruction to students, and helping students develop their personalities and life skills.

35.     While employed at FCHS, Tucker was among the most accomplished teachers in the school and consistently received outstanding evaluations. Every year he was praised by the administration for his excellence in the classroom and the positive impact he had on students' lives.

36.     Further, Tucker was beloved by his fellow teachers and the student body. Consequently, in 2014, Tucker was offered and accepted the position of Dean at FCHS.

37.     As Dean, Tucker was responsible for the wellbeing of FCHS students. Tucker worked with the FCHS principal to plan chapels, retreats, outreach projects, and student mentoring opportunities that were designed to provide opportunities for growth. Tucker was also responsible for new student assimilation.

38.     The benefits Tucker received as a teacher and Dean at FCHS included ordinary employment benefits like health insurance and paid time off, but they did not include any special benefits available only to clergy members, like a parsonage allowance.

39.     In June 2017, Tucker was given the responsibility of organizing FCHS' weekly chapel meetings ("Chapel Meetings"). Chapel Meetings are designed to address various issues that might face FCHS students. Chapel Meetings addressed a variety of issues ranging from teen social issues like substance abuse to logistical details of the role of the FCHS administration and navigating life as a student at FCHS.

40.     The responsibility for organizing Chapel Meetings had, historically, been reserved for the FCHS principal. It was assigned to Tucker as a token of trust and respect for the excellent work he had been doing as a teacher at the school.

41.     When Tucker was given responsibilities for planning Chapel Meetings, his job title did not change, nor was he given a pay raise.

42.     Neither before or during his tenure as a teacher and Dean at FCHS was Tucker ever ordained or anointed as a member of the Church's clergy. Nor was he ordained or anointed a member of the clergy of any other religious organization.

43.     In fact, Tucker did not attend the Church, nor was he required to in order to maintain his employment with FCA. Rather, Tucker attended another local church, unaffiliated with FBCI or any of its enterprises.

**III.     RACIAL HOSTILITY AT FCHS AND TUCKER'S EFFORTS TO ADDRESS IT.**

44.     In 2011, shortly after returning from doing humanitarian work in the Dominican Republic, Tucker and his wife adopted their daughter, who is ethnically Haitian and of African descent.

45.     That Tucker was the father of a black daughter was communicated to FCA managers and was well known throughout FCHS.

46.     Tucker regularly communicated his beliefs that racism is morally wrong and anti-Christian.

47.     For example, during the 2016 state and national elections, he was vocal in his opposition to racism on his Facebook page, postings to which many FCHS students and teachers had access.

48.     In 2016, Tucker became the target of racial harassment at FCHS. After a school assembly, FCHS students were requested to provide feedback via an app called "Poll Everywhere" and via paper submissions. Student responses in the app and on paper contained comments regarding the fact that Tucker has a black daughter, including the statement that Tucker is a "nigger father."

49.     Tucker also learned that another teacher at FCHS had set up an online game for students to play in his classroom and, within the game, many students created usernames that contained the word "nigger."

50.     When that teacher became aware that his students were using racist usernames in the classroom game he had created, the teacher requested Tucker's advice and assistance in addressing the issue. Tucker met with Andrew Hasz ("Hasz"), who was then Principal of FCHS, to raise his concerns regarding racism at FCHS.

51.     In Tucker's meeting with Hasz, which took place on November 9, 2016, Tucker made Hasz aware that students had called him a "nigger father" and that they had created "nigger"-oriented usernames in an online classroom game.

52.     Hasz did not provide a meaningful solution to these incidents.

53.     Also on November 9, 2016, Tucker e-mailed Hasz regarding the incidents discussed in their meeting of the same date.

54.     After Hasz and FCHS failed to adequately address the racism that Tucker identified, there were further incidents of racism directed toward minority students at FCHS. For example, Tucker observed: frequent taunting of African-American students with racial slurs such as "nigger" and "slave"; taunting of Hispanic students with ethnic slurs; white students dressing in

KKK hoods and mock-executing minority students; open class statements promoting neo-Nazism and white supremacy in the presence of students of color; belittling and bullying of students who raised racial issues; and circulating of racist commentary on social media among FCHS students.

55.     A disgusting example of the type of literature in circulation at the school was the following Instagram post by a FCHS student, which was "liked" by other FCHS students:



56.     Moreover, the school refused to recognize MLK Day or Black History Month.

57.     Accordingly, Tucker once again communicated to his superiors that FCHS needed to address racism in the school. Specifically, Tucker met with Wall and Hasz in December 2016.

58.     While communicating his opposition to racial harassment at the school to Wall and Hasz, Tucker repeatedly emphasized that not only was this kind of behavior offensive and unacceptable in a Christian (or any other) educational institution, but that he was personally offended by racism of this nature because of his black daughter.

59.     Neither Wall nor Hasz offered meaningful solutions to the racial harassment Tucker discussed with them in December 2016.

60.     Six minority students withdrew or were disenrolled from FCHS in December 2016. All six mentioned the racist comments and lack of diversity at FCHS as at least part of the reason for their decision to leave the school.

61.     In January 2017, Wall announced that he would retire in March 2017, that Hasz would replace him as Superintendent, and that Michael Cook ("Cook") would replace Hasz as FCHS Principal.

62.     Subsequently, Tucker emailed Wall and Hasz that racism at FCHS needed to be addressed. Neither Wall nor Hasz responded to Tucker's email.

63.     In a demonstration of his own commitment to change the racist culture at FCHS, Tucker undertook an effort to interview minority students and alumni of the school between January and August 2017 to learn more about their experiences at the school and how racism may have affected them.

64.     Shortly after being given responsibility for planning Chapel Meetings in June 2017, Tucker decided to dedicate one such meeting to discussing race and faith with the FCHS student body and teachers (the "Race and Faith Chapel").

65.     Tucker planned the Race and Faith Chapel to take place the Friday before MLK Day weekend 2018, which was January 12, 2018.

66.     In a staff meeting held on January 5, 2018, Tucker communicated his plans for the Race and Faith Chapel to the FCHS faculty. The faculty, as well as Cook, were supportive.

67.     On January 9, 2018, Tucker emailed all FCHS parents to explain that the Race and Faith Chapel would be held on January 12, 2018. In response to parent requests, Tucker agreed to

livestream the event through FCHS' internal video streaming service so that interested parents could also watch the Race and Faith Chapel.

68.     After Tucker sent his January 9, 2018 email to FCHS parents, Cook and Hasz texted Tucker offering their support for the Race and Faith Chapel.

69.     On January 12, 2018, the Race and Faith Chapel was held as planned.

70.     There, a panel of invited speakers, which Tucker moderated, discussed racism at the school and possible ways for students to be more respectful of one another.

71.     One of the Race and Faith Chapel speakers was an FCHS alumnus.

72.     After the Race and Faith Chapel concluded, both Hasz and Cook expressed to Tucker that they were happy with the substance and content of the Race and Faith Chapel.

73.     For example, in the hours following the Race and Faith Chapel, Cook sent Tucker a text message stating: "Hi Gregg, I left after Herzog's Q/A—how did everything end? I thought the panel was great! . . . Thank you for taking on hard topics that are important for the kids to pray and wrestle with at this time in their lives. I hope you have a wonderful weekend and know that you are incredibly valued at FCHS!"

74.     Hasz also sent Tucker an email similarly praising Tucker for his efforts in organizing the Race and Faith Chapel, and indicating that he believed the event was successful.

75.     On January 14, 2018, Tucker drafted a letter to the FCHS staff that summarized reactions to the Race and Faith Chapel, both positive and negative. Tucker asked Cook to review the letter before he sent it to the FCHS staff, which Cook did. Specifically, Cook approved of the letter's content and of Tucker circulating it. Tucker sent the letter to FCHS staff via email on January 15, 2018.

76.     Not everyone, however, had such a positive view of the Race and Faith Chapel. Between January 13 and 15, 2018, a group of parents circulated an essay that expressed vitriolic disagreement about the Race and Faith Chapel. The essay was written by an FCHS student who had previously openly expressed neo-Nazi sympathies.

77.     Thereafter, a small number of parents complained to FCHS management, including Hasz and Cook, that they considered the Race and Faith Chapel inappropriate and to have caused harm to their children.

78.     In response to these emails, Hasz and Cook met with Tucker on January 16, 2018. In the meeting, they reversed their previous course and characterized the Race and Faith Chapel negatively.

79.     Also in their January 16, 2018 meeting, Hasz and Cook communicated to Tucker their intent to hold a meeting amongst FCHS parents and the administration, with Tucker present, to address the Race and Faith Chapel.

80.     Following Hasz and Cook's meeting with Tucker, Hasz and Cook sent an email to all parents apologizing for the content and tone of the Race and Faith Chapel. In the email, Hasz and Cook blamed Tucker for a supposedly flawed message and announced that Tucker's role in organizing the Race and Faith Chapel would be investigated. Before the email was sent, Tucker told Hasz and Cook, via phone, that he disagreed with its content and distribution. After the email was sent, Tucker again expressed his disagreement with its circulation via email and in person.

81.     Also following the meeting with Tucker, Hasz and Cook informed Tucker that he was no longer invited to attend the planned parent meeting, which was subsequently held on January 17, 2018 (the "Parent Meeting").

82.     Hasz, Cook, and Newcomb were present at, and moderated, the Parent Meeting. Tucker did not attend the meeting per Hasz and Cook's direction.

83.     Moreover, the only parents invited to attend the Parent Meeting were those who had expressed discontent or disagreement with the Race and Faith Chapel. The organizers did not make all FCHS parents aware that the meeting would be held.

84.     The vast majority of the parents who spoke at the Parent Meeting expressed that they chose to send their children to FCHS—and to pay money to do so—specifically to insulate them from discussions of matters addressed at the Race and Faith Chapel. These parents characterized those matters as issues of "social justice" and "politics," discussion of which they considered harmful to their children.

85.     To communicate that point, one parent commented that if she wanted her child to be exposed to "social justice" like that which was addressed at the Race and Faith Chapel, she would have sent her child to Manual High School ("Manual").

86.     Manual is a high school located in a historically black Denver, Colorado neighborhood. Manual is not located near FCHS and, on information and belief, would not be the neighborhood school for the child of the parent who made this comment.

87.     Another of the parents who spoke at the Parent Meeting is the father of one of the FCHS students who "liked" the Instagram post depicted in Paragraph 56, above.

88.     At the Parent Meeting, several derogatory comments were directed at Tucker personally. Among these, one of the school's former teachers voiced dissatisfaction with Tucker's social media postings during the lead-up to the 2016 presidential election. The teacher explained that she had made a post on Tucker's Facebook page expressing disagreement with Tucker's

opposition to what Tucker viewed as now-President Donald Trump's racism, and that when Tucker responded to her post explaining the basis for his views, she "unfriended" him.

89.     Notwithstanding the general sentiment against Tucker and his actions that dominated the Parent Meeting, one parent spoke in support of Tucker's efforts behind the Race and Faith Chapel.

90.     After expressing outrage that only those parents who opposed Tucker and the Race and Faith Chapel had been invited to the Meeting in the first place, this parent explained that her black daughter had experienced significant discrimination and hatred while attending FCHS. She made clear that it was imperative to minority students and others who were committed to an equitable educational environment that FCHS address the blatant racism that permeated the school's culture.

91.     The Parent Meeting concluded with various demands of the FCA administration, including Tucker's termination.

## IV.    FBCI'S AND ITS AGENTS' RETALIATION AGAINST TUCKER FOR HIS SPEAKING OUT AGAINST RACISM AT FCHS.

92.     On January 19, 2019, Hasz and Cook met with Tucker. Hasz and Cook told Tucker that, in response to parent complaints, he would no longer have the responsibility of planning Chapel Meetings. Hasz and Cook also told Tucker that he was banned from speaking in front of students at future Chapel Meetings.

93.     On information and belief, Hasz, Cook, and Newcomb made the decision to strip Tucker of his Chapel Meeting planning responsibilities.

94.     Notwithstanding his being stripped of his Chapel Meeting planning responsibilities, Tucker remained employed in his jobs as teacher and Dean at FCHS.

95.     In the aftermath of Tucker's demotion, several teachers and parents expressed support for Tucker to Hasz, Cook, and Newcomb.

96.     For example, on January 19, 2018, a long-tenured Bible teacher at the school sent a letter to Hasz and Cook explaining what a positive influence she believed Tucker to be on the students, teachers, and parents at FCHS.

97.     Also, on January 27, 2018, a group of minority parents met with Hasz, Cook, and Newcomb to discuss racism at FCHS and their disagreement with the way Tucker had been treated in the wake of the Race and Faith Chapel. In that meeting, the parents in attendance requested that Tucker be the primary faculty advocate for minority students, and that he not be demoted or terminated.

98.     On January 26, 2018, Tucker met with Hasz and Cook to seek clarification from them about what his role as Dean would be from that point forward. Hasz and Cook did not provide Tucker with a clear answer.

99.     In that January 26, 2018 meeting, Hasz confirmed that the decision to ban Tucker from speaking in front of the student body was one made by the FBCI Board.

100.     In the January 26, 2018 meeting Tucker expressed his frustration to Hasz and Cook that the Chapel planning responsibilities had been taken away from him as the consequence of a small group of parents reacting negatively to his efforts to address racism at FCHS.

101.     Subsequently, on January 28, 2018, Tucker sent an email to Cook, Hasz, and an FBCI Board member expressing frustration that he was no longer responsible for Chapel Meeting planning responsibilities and banned from speaking in front of the student body.

102.     On or about January 29, 2018, Tucker again met with Cook and Hasz, and this time they were joined by Newcomb.

103.     Newcomb attacked the content of the Race and Faith Chapel, belittled the alumnus who spoke on the panel of presenters at the Race and Faith Chapel, and told Tucker, "Sorry if this sounds harsh, Gregg, but this is a business, and if we lose a dozen students, teachers start losing their jobs."

104.     Tucker requested that Newcomb permit him to meet with the Board as a whole, and Newcomb told him that would not be possible.

105.     On January 30, 2018, Cook spoke with Tucker privately. In tears, Cook apologized to Tucker for the way that Tucker was being treated and for not better supporting Tucker. Cook said that he was trying to balance the way that he felt about the situation personally with submitting to those who were in a position of greater authority.

106.     On February 6, 2018, Tucker sent a letter to a handful of parents to explain his view of the events to that point and to express his commitment toward FCHS and toward eradicating racism in the school.

107.     Tucker sent a copy of this letter to Hasz and Cook, both of whom agreed with Tucker's sending the letter.

108.     Nevertheless, between February 6 and 15, 2018, Tucker had a series of conversations with Hasz and Cook in which it became clear that FBCI was becoming increasingly adverse to Tucker.

109.    For instance, on February 6, 2018, Tucker met with Hasz to discuss his future at FCHS. Hasz indicated to Tucker that he may not be "a good fit" for the school. Hasz confirmed that the reason for that was because of negative parent reaction to the Race and Faith Chapel.

110.    On February 13, 2018, Hasz requested that Tucker explain feedback that Tucker received when he met with minority students and alumni in 2017, as discussed in paragraph 64, above. Tucker provided Hasz with many examples of racism that he learned about during those meetings. Tucker also referenced incidents Tucker had previously complained of, to Hasz, in Fall 2016. Hasz responded, via email, to the effect of "thanks."

111.    On February 15, 2018, FCHS held parent-teacher conferences. During the conferences, Hasz met with Tucker and told him that he was polarizing for many parents, that he could not be trusted in the classroom, and that he was no longer a "good fit" at the school. Hasz explained that, consequently, Tucker's employment contract would not be renewed after it expired at the end of that school year.

112.    Immediately after he met with Hasz, a number of faculty members asked Tucker how the meeting had gone, and Tucker told them that his teaching contract would not be renewed. Tucker's colleagues suggested that all faculty have a meeting (to which they referred as a "family meeting") to discuss this turn of events, and also encouraged Tucker to send an email to the faculty to explain his contract termination.

113.    Tucker sent such an email on February 17, 2018.

114.    Subsequently, one of Hasz's sons, himself a student at FCHS, discussed Tucker's email on social media and described it as "insubordinate." Presumably, Hasz's son learned of the email from Hasz himself.

115.    On February 19, 2018, parents and faculty supportive of Tucker circulated a petition requesting that the FCA administration address racism at FCHS and that Tucker not be demoted or terminated. The petition was signed by hundreds of then-current FCHS students, teachers, parents, and alumni. Many of the signatories included comments with their signatures discussing racism at FCHS and offering their support of Tucker.

116.    After Tucker sent his February 17, 2018 email to the FCHS faculty, FBCI decided to terminate Tucker's employment effective immediately. Thus, on February 26, 2018, Hasz and Cook met with Tucker and told him that his employment was terminated.

117.    FBCI was motivated to fire Tucker by his opposition to the racially hostile and discriminatory environment at FCHS and in an effort to appease certain parents of FCHS students. In the February 26, 2018 meeting, Hasz openly admitted that Tucker was being fired for his role in organizing the Race and Faith Chapel and because of parent backlash to the event.

118.    In the meeting, Hasz also asked Tucker to agree to a joint statement that he said explained the reasons for Tucker's termination.

119.    The joint statement said that Tucker "mutually agreed" to resign and that the decision had "nothing to do with race and equality." Tucker did not agree to the joint statement because he viewed it as inaccurate and incomplete. Tucker clearly explained to Hasz and Cook that his reason for refusing to sign the joint statement was that he had not committed, nor had he ever before that day been accused of committing, insubordination.

120.    Immediately following the termination of Tucker's employment, Hasz sent an email to the parents of all 1,000+ students at FCHS and falsely claimed Tucker had mutually

agreed to resign. Hasz further falsely represented that Tucker's termination had "nothing to do with the topic of race or equality."

121.    Though Hasz said in his email that it was "ongoing differences" that led to the purported "mutual agreement" that Tucker would resign, Hasz did not identify those differences in his email.

122.    The next day, Hasz told the faculty, wrongly, that Tucker had resigned and that the reason was that he had been guilty of insubordination.

123.    Hasz further informed the faculty that any person who signed the petition circulated in opposition to racism and in support of Tucker, discussed above, was likewise guilty of insubordination. At that point, five faculty members had signed the petition. One of the faculty signatories openly admitted to Hasz and Cook that she had signed it and offered her resignation for insubordination if they wanted. Hasz and Cook did not accept her resignation and she remained employed at FCHS.

124.    In both public and private settings, Hasz has continued to misrepresent the basis for Tucker's termination. Hasz has repeatedly stated that Tucker voluntarily resigned for reasons unrelated to the Race and Faith Chapel, which is untrue.

125.    On May 25, 2018, Tucker filed complaints with the Colorado Civil Rights Division and the Equal Employment Opportunity Commission ("EEOC"). Tucker received his right to sue notice from the EEOC on April 30, 2019.

## FIRST CLAIM FOR RELIEF
### (Retaliation in violation of 42 U.S.C. Section 2000e-3(a))

126.    Tucker incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

19

127.     Tucker engaged in protected activity under 42 U.S.C. Section 2000e(a) by opposing a racially hostile environment. Specifically, the environment at Tucker's place of employment was hostile toward Tucker as the white father of a black daughter, and toward racially diverse students. Racial insults directed against Tucker personally and, additionally, racially hostile acts and insults directed at others, created a racially intimidating environment that interfered with the effective discharge of Tucker's duties and responsibilities as a high school teacher and Dean.

128.     Tucker opposed this hostile work environment by telling school administrators about it and requesting that they remedy it, by organizing the Race and Faith Chapel to address the racial hostility directly with students, and by opposing FBCI's efforts to minimize the impact of the Race and Faith Chapel after it occurred.

129.     Tucker fell within the zone of interest of those protected under Title VII because he himself was an FBCI employee entitled to Title VII protection and because he was a teacher and Dean. In his role as teacher and Dean, Tucker's employment responsibilities included ensuring the welfare of students who were subject to racial harassment at the school.

130.     Opposing racial harassment was important to Tucker as an employee-victim of such harassment and because protecting students from racial harassment was an important aspect of his job.

131.     As a direct response to Tucker's opposition to racial harassment, FBCI retaliated against Tucker through a series of wrongful acts: 1) it removed Tucker from his position as Chapel director; 2)  it removed him from his position as Dean; 3) it gave Tucker notice that his contract would not be renewed at the end of the year; and 4) it then terminated his employment.

132.     Tucker's opposition to racial harassment was a motivating factor in his termination, and he would not have been terminated but for his opposition to racial harassment.

133.     As a result of a course of retaliatory conduct and Tucker's ultimate termination, Tucker was damaged. Tucker's damages include emotional distress, loss of emotional value of his work, and loss of salary and other employment benefits, the value of which shall be proven at trial and determined by a jury.

134.     FBCI's retaliatory conduct was wanton, fraudulent, and malicious and done with an intent to harm Tucker. FBCI's intent to harm Tucker is evidenced, in part, by its agents' public statements about him known by FCBI to be false. FCBI's conduct thereby entitles Tucker to an award of exemplary damages.

### SECOND CLAIM FOR RELIEF
### (Retaliation in violation of 42 U.S.C. 2000d ("Title VI"))

135.     Tucker incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

136.     Plaintiff is informed and believes that FBCI is subject to Title VI because it owns and operates an educational institution that, on information and belief, receives federal support in the form of financial assistance, scholarship grants and subsidies, and tax exemptions. Furthermore, the retaliatory acts that are the subject of this First Amended Complaint concern discrimination in FBCI's educational activities.

137.     Tucker is protected under Title VI as an employee of FBCI. Moreover, his opposition to discriminatory practices—irrespective of his employment status—constitute protected activity under Title VI.

138.    Tucker's opposition to racial harassment was a motivating factor in his termination, and he would not have been terminated but for his opposition to racial harassment.

139.    As a result of a course of retaliatory conduct and Tucker's ultimate termination, Tucker was damaged. Tucker's damages include emotional distress, loss of emotional value of his work, and loss of salary and other employment benefits, the value of which shall be proven at trial and determined by a jury.

140.    FCBI's retaliatory conduct was wanton, fraudulent and malicious, and done with an intent to harm Tucker. FCBI's intent to harm Tucker is evidenced, in part, by its agents' making public statements about him known by FCBIto be false. FCBI's conduct thereby entitles Tucker to an award of exemplary damages.

### THIRD CLAIM FOR RELIEF
**(Wrongful Termination Under Common Law)**

141.    Tucker incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

142.    It is the public policy of the State of Colorado to abide by the laws of the United States prohibiting discrimination on the basis of race in Colorado Schools in accordance with Title VI.

143.    This policy confers on teachers and students alike the obligation and right to oppose racial discrimination in school.

144.    FCHS adopted that policy into rules set forth as binding on its students and teachers.

145.    During the course of Tucker's employment, Tucker exercised his right as a teacher and Dean at FCHS to oppose practices that he reasonably believed violated Title VI.

146.    During the course of Tucker's employment, Tucker exercised his right and duty as a teacher and Dean to request FCA adhere to its own non-discrimination policies by attempting to eradicate racial hostility at FCHS.

147.    During the course of Tucker's employment, Tucker exercised his right and duty as a teacher and Dean to protect and promote the safety and well-being of FCHS students by attempting to eradicate racial hostility at FCHS.

148.    Tucker reasonably believed that he had a right to seek adherence to the FCA anti-discrimination policies and to promote the safety and well-being of FCHS students.

149.    FBCI was aware or reasonably should have been aware that that Tucker reasonably believed that he had a right to seek adherence to the FCA anti-discrimination policies and to promote the safety and well-being of FCHS students.

150.    FBCI discharged Tucker because Tucker sought adherence to the FCA anti-discrimination policies and promoted the safety and well-being of FCHS students.

151.    As a consequence of FBCI's conduct in discharging Tucker, Tucker has suffered damages and losses in amounts to be proved at trial.

WHEREFORE, Plaintiff Gregory Tucker respectfully requests that this Court enter judgment in his favor and against Defendant Faith Bible Chapel International and award him all relief allowed by law, including but not limited to the following:

(a) All appropriate relief, including available equitable injunctive relief;

(b) Compensatory and consequential damages as allowed by law in an amount to be determined at trial;

(c) Punitive damages as allowed by law and in an amount to be determined at trial;

(d) Attorneys' fees and the costs associated with this action, including expert witness fees, as allowed by law;

(f) Pre- and post-judgment interest at the appropriate lawful rate; and

(g) Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF RESPECTFULLY REQUESTS A TRIAL BY JURY
ON EACH OF THE ABOVE-STATED CLAIMS.**

Dated this 3rd day of September, 2019.

Respectfully submitted,

**LEVIN SITCOFF PC**

*s/ Peter G. Friesen*
*s/ Elisabeth L. Owen*
Peter G. Friesen
Bradley A. Levin
Elisabeth L. Owen
Elizabeth A. Walker
1512 Larimer Street, Suite 650
Denver, Colorado 80202
Telephone: 303-575-9390
Fax: 303-575-9385
pgf@levinsitcoff.com
bal@levinsitcoff.com
elo@levinsitcoff.com
eaw@levinsitcoff.com